## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MICHELLE L. KIDDER,**

   **Plaintiff,**

  **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

   **Defendant.**

Case No. 1:18-cv-661
**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Bowman**

### ORDER

This cause comes before the Court on Plaintiff Michelle L. Kidder's Objection (Doc. 15) to Magistrate Judge Bowman's Report and Recommendation ("R&R") (Doc. 14), which recommends that this Court affirm the Administrative Law Judge's ("ALJ") finding that Kidder does not qualify for disability insurance benefits. For the reasons stated more fully below, the Court **OVERRULES** Kidder's Objection, **ADOPTS** Magistrate Judge Bowman's R&R, and **AFFIRMS** the ALJ's finding. Accordingly, the Court **DISMISSES WITH PREJUDICE** Kidder's Complaint (Doc. 1) and **DIRECTS** the Clerk to enter judgment.

### BACKGROUND

This case arises from the denial of Kidder's application for disability insurance benefits, which Kidder filed with the Social Security Administration on April 16, 2015. (Doc. 7-3 at #125). In that application, she alleges that she had been under a

"disability" since March 12, 2014.[1] (*Id.*). Kidder asserted that she was disabled due to rheumatoid arthritis, cervical degenerative disc disease, obesity, carpal tunnel syndrome in both hands, chondromalacia in her left knee, depression, and anxiety. (*Id.* at #126; *see also* Doc. 7-2 at #72).

The Social Security Administration denied her claim upon initially reviewing it and then again after reconsidering that initial decision at Kidder's request. (Doc. 7-2 at #72). After the Administration denied her Application, Kidder filed a request for an ALJ to review the Administration's decision on April 7, 2016. (*Id.*).

On August 30, 2017, about 16 months after Kidder filed her request, the assigned ALJ held a hearing in Dayton, Ohio. (*Id.* at #69). Kidder appeared at the hearing, represented herself without counsel, and testified on her own behalf. (*Id.*). By way of background, Kidder testified at the hearing that she is 5' 2.5" tall,[2] weighs 220 pounds, was born in 1972 (and so she was 44 years old when the hearing occurred), graduated from high school and briefly enrolled in college, and worked as a licensed practical nurse ("LPN") until she quit in March 2014. She says she quit because she tore the meniscus in her left knee and developed arthritis there. (*Id.* at #72, 74, 92–95). Kidder also stated that she had divorced her second husband around the time that she had experienced problems in her knee, and that he had moved out

---

[1] The R&R stated that Kidder alleges her disability began on March 12, 2004. (R&R at 1, #983). Because the record shows that Kidder alleges a disability onset date of March 12, 2014 (Doc. 7-2 at #73), however, the onset date in the R&R is clearly a typographical error.

[2] Although the ALJ wrote in the Decision that Kidder testified at the hearing that she is 52 inches (i.e., 4'4" tall), Kidder's medical records show that her height is actually 5'3" (i.e., she is roughly 63 inches tall). (R&R at n.1, #72). And the hearing transcript indicates that Kidder actually testified she is 5' 2.5" tall. (Doc. 7-2 at #92). So, it seems that the portion of the ALJ's Decision about Kidder's testimony on her height is a typographical error.

of their home in May 2015. (*Id.* at #93). Kidder further testified that, at the time of the hearing, she lived with her son. According to Kidder, her son was then a teenager, homeschooled, and also had medical issues. (*Id.* at 110–11). She explained that she provided care to her son and helped him with his schoolwork. (*Id.* at #110).

As for Kidder's medical care, Kidder testified that she sees a rheumatologist, Dr. Kimberly S. Hendricks, for her arthritis, and she takes medications that decrease the swelling in some of her joints but increase it in others. (*Id.* at #97–100). She said that she did not, however, take any narcotic medications for pain. (*Id.* at #100). Rather, Kidder said, she underwent physical therapy for her back and neck pain, which her doctor told her did not require surgery. (*Id.* at 98–99). Kidder testified that she had undergone surgery for her carpal tunnel syndrome in 2016, but still experienced some lingering effects from that procedure. (*Id.* at #101). Kidder also noted she takes Xanax and Effexor for depression, but had not sought psychological counseling or required any hospitalization for that condition. (*Id.*).

Given her physical conditions, Kidder explained that if she sat too long then her ankles would swell and her hips would hurt, and she would experience neck pain whenever she looked down. (*Id.* at #99–100). Despite those issues, Kidder testified that she could walk a half-block without pain, lift ten pounds with each arm, and was able to cook, clean, shop for groceries, and attend church. (*Id.* at #104–06). Consistent with Kidder's testimony, the ALJ noted during the hearing that Kidder's medical records indicate that she had been diagnosed with rheumatoid arthritis and carpal tunnel syndrome. (*Id.* at #73, 99–100).

After Kidder testified, a court-appointed vocational expert, Brian L. Womer, testified at the hearing. (*Id.* at #112). The ALJ asked Womer various hypothetical questions about the types of jobs that someone with conditions like Kidder's could perform. (*Id.* at #112–14). Based on his experience in vocational rehabilitation, education, research, and training, Womer testified that a hypothetical individual with Kidder's vocational profile, including the additional specific functional limitations that the ALJ had found appropriate for Kidder, could still perform as many as 3,380,000 unskilled jobs in the national economy that required, at most, "light" or "sedentary" levels of exertion. (*Id.* at #80, 81, 113–16). Womer then identified examples of those jobs, which included office helper, cashier, housekeeper, food order clerk, and telephone quote clerk. (*Id.* at #80, 113–16).

In addition to testimony from Kidder and Womer, the record evidence submitted to the ALJ included the written opinions of three non-treating physicians. (*Id.* at #73–74). Each physician had evaluated Kidder's medical records for the Administration prior to Kidder's initial and reconsideration proceedings of her Application. (*Id.* at #76). Two of those three submitted opinions as to Kidder's physical capabilities. (*Id.*). Both of those non-treating physicians opined that, given Kidder's specific physical limitations, she could perform "light" work activity, which included: using her lower left extremity for foot controls "occasionally"; climbing ramps and stairs "frequently"; climbing ladders, ropes, and scaffolds "occasionally"; kneeling, crouching, and crawling "occasionally"; and "avoiding" concentrated exposure to

4

extreme cold, vibrations, and hazards, such as unprotected heights and commercial driving. (Doc. 7-3 at #125–38, 140–54).

About four months after the hearing, on December 26, 2017, the ALJ issued her Notice of Decision, which found that Kidder does not qualify for disability insurance benefits as she is not "disabled." (Doc. 7-2 at #66, 71). The ALJ did not dispute that the severe impairments that Kidder alleged in her application are both "medically determinable" and severe enough to prevent her from performing her previous job as a home nurse. But the ALJ found that Kidder's "residual functional capacity" ("RFC")—i.e., her ability to perform sustained, work-related physical and mental activities in a work setting on a regular and continuing basis—combined with her age, education, and work experience, meant Kidder's impairments are not severe enough to prevent her from engaging in "substantial gainful activity" that is necessary to perform certain jobs available in the regional or national economies. (*Id.* at #69–81).

Relevant here, the ALJ concluded that Kidder has an RFC for "light" work, as defined by 20 C.F.R. § 404.1567(b). (*Id.* at #75). To make that finding, the ALJ relied on the two non-treating physicians who had evaluated Kidder's physical functional capacity as part of the initial and reconsideration proceedings before the Administration. Those physicians had concluded that Kidder could perform "light" work. (*Id.* at #76). The ALJ gave "great weight" to the two non-treating physicians' opinions because they were the only "detailed, specific" medical opinions as to Kidder's physical functioning. (*Id.*). In contrast, the ALJ did not defer to the notes

taken by Kidder's treating physicians that were contained in her medical records, as the ALJ found that those statements were not medical opinions appropriate for consideration in determining whether Kidder is "disabled" under the Social Security Act. (*Id.*). For example, the ALJ determined that Kidder's rheumatologist, Dr. Hendricks, did not state an adequate medical opinion—and likely did not state her own opinion at all—when she "routinely" wrote in her treatment notes: "Discussed that she is not physically able to return to work at this time." (*Id.*). The parties agree that Kidder's treating physicians did not submit medical opinions as to her functional capacity.

In arriving at her finding that Kidder had an RFC for "light" work, the ALJ also discussed the medical records related to Kidder's physical functioning. More specifically, the ALJ noted that Kidder has "significant cervical spine disease," (*id.* at #77), but discounted the effect that disease had on Kidder's functional capacity because, although an MRI indicated that Kidder's spinal cord is in contact with her spinal canal, a subsequent electromyography procedure ("EMG") showed that there was no radiculopathy (conditions resulting from a compressed nerve) or other abnormalities related to her spinal cord (*id.*). Further, the ALJ pointed out that after Kidder underwent an MRI, she visited a surgeon who determined that Kidder only had mild canal stenosis and that her symptoms were scattered and so she did not require surgery. (*Id.*). Moreover, the ALJ found that Kidder's medical records indicate that she had a full range of motion in her neck, sometimes had an altered gait (but other times had a normal gait), and that medical records submitted after the

6

hearing—which were therefore not available to the non-treating physicians when they submitted their opinions—show that Kidder did not have any significant deterioration as to her cervical spine, arthritis, or left knee conditions, but rather, "perhaps, even some improvement" of those conditions, based on her recent "substantial pain management and continued rheumatoid specialist treatment." (*Id.*).

Finally, the ALJ noted that, although the non-treating physicians did not have medical records related to Kidder's moderately severe carpal tunnel syndrome, Kidder had two surgeries to ameliorate her condition (one in October 2016 and another in December 2016), which (according to a January 2017 post-surgery examination) improved Kidder's grip strength in both hands. (*Id.*). But because those medical records likewise were not available to the non-treating physicians when they submitted their opinions of Kidder's physical functioning, the ALJ added a limitation to Kidder's RFC regarding handling and fingering, which the ALJ found she could only complete "frequently." (*Id.*). In practical terms, that limitation restricted Kidder to six hours of handling and fingering activities at work each day. (*Id.*). Accordingly, the ALJ found that Kidder could perform "simple, low stress work." (*Id.* at #77–78).

Based on those findings and in light of Kidder's age, education, and work experience, the ALJ determined that Kidder could not perform her past work as a nurse and that she does not have transferable work skills, but that other jobs exist in significant numbers in the national economy that Kidder could adequately perform. (*Id.* at #79–80). Thus, the ALJ concluded, under the Social Security Act, Kidder is not "disabled." (*Id.* at #81).

Kidder then timely filed suit in this Court, on September 20, 2018, challenging the ALJ's determination. (Doc. 1). Now represented by counsel, Kidder advanced two claims of error, which became ripe for review on May 13, 2019. (*See* Docs. 8, 11, 12). On March 6, 2020, the Magistrate Judge issued the R&R, which recommends that this Court overrule both of those claims and affirm the ALJ's finding. (Doc. 14). Two weeks later, Kidder objected to the R&R. In her objections, she asserts several general claims of error that this Court construes as three specific objections. (Doc. 15). Roughly three weeks after Kidder filed her Objection, on April 7, 2020, the Commissioner filed his Response. (Doc. 17). Kidder's Objection to the R&R is thus ripe for this Court's review.

## LEGAL STANDARD

If a party objects within the allotted time to a report and recommendation, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b). Upon review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Here, though, the Magistrate Judge was reviewing a Commission decision. In such cases, the Magistrate Judge's role is "limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Combining the two standards of review, the Court's task in this matter is to review de novo, based on the specific objections that Kidder raised to the R&R, the Magistrate Judge's determination in that R&R that the ALJ's decision was supported by substantial evidence.

## DISCUSSION

In Kidder's Objection, Kidder asks this Court to reverse the ALJ's finding that she was not disabled. She claims that the ALJ's decision is wrong because: (1) the ALJ relied on the opinions of non-treating physicians, even though those physicians did not review evidence of her carpal tunnel syndrome that was available in medical records that were submitted to the ALJ after those physicians provided their opinions; (2) the ALJ considered some of the record evidence, but failed to consider other portions of the record evidence, when determining Kidder's RFC; and (3) the ALJ erred by "interpret[ing] the raw medical data … into functional terms[,]" rather than relying on physician opinions interpreting that medical data. (Pl.'s Obj. at 3, #998). The Court addresses each of these arguments.

To qualify for disability insurance benefits, a claimant must show that she suffers from a "disability," which Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*, defines as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment … ." *Id.* at

9

§ 423(d)(1)(A). Thus, an individual is found to have a "disability" only if "[her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy … ." *Id.* at § 423(d)(2)(A). Pursuant to statutory authority, the Secretary of Health and Human Services has adopted regulations that govern eligibility for disability insurance benefits. CFR pt. 404, subpart P (1985). The regulations establish a five-step "sequential evaluation" process:

> First, the claimant must demonstrate that [s]he has not engaged in substantial gainful activity during the period of disability. Second, the claimant must show that [s]he suffers from a severe medically determinable physical or mental impairment. Third, if the claimant shows that h[er] impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, [s]he is deemed disabled. Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform h[er] past relevant work, in which case the claimant is not disabled. Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as h[er] age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)). "The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five." *Id.* (citation omitted).

Each of Kidder's arguments relates to the ALJ's findings at the fourth step, i.e., that Kidder's RFC is "light" work. This was an issue on which Kidder bore the burden of proof before the Commission. With that in mind, the Court turns to Kidder's

three objections to the Magistrate Judge's R&R upholding the ALJ's findings on that issue.

Kidder first argues that the ALJ erred by improperly giving "great weight" to the opinions of non-treating physicians who did not review Kidder's medical records related to her carpal tunnel syndrome diagnosis. As the ALJ discussed in her decision, the non-treating physicians did not review those records because they were submitted to the ALJ three months after the hearing. Kidder also argues that the ALJ erred by relying on the non-treating physicians' opinions without also mentioning that those physicians had not reviewed an MRI of Kidder's cervical spine, which revealed that she had discogenic disease.

In raising those arguments, however, Kidder does not provide any legal authority for her propositions that, in determining a claimant's RFC, the ALJ can only give "great weight" to non-treating physicians who have reviewed the entirety of a claimant's medical record. To the contrary, the Sixth Circuit has explained that an ALJ does not err by relying on a non-treating physician's opinion as to a claimant's RFC, even if that physician did not have the opportunity to review post-opinion treatment records, so long as the ALJ herself gives "some indication that [she] at least considered [the ongoing treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'" *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007) (internal citation omitted)). In other words, where the physician has not reviewed the post-opinion records, the ALJ must review them and consider

whether the physician's opinion, which did not include consideration of those records, is in some way tainted as a result.

Under that standard, the ALJ did not err here. Although the non-treating physicians were unable to review later-arising medical records from Kidder's ongoing treatment (which occurred after they finalized their opinions), the ALJ herself did review and consider those records. She concluded that the notes contained therein supported the finding that Kidder could complete "light" work, and thus were consistent with the non-treating physicians' already-tendered opinions. For example, the ALJ determined that, although Kidder had discogenic disease, EMGs indicated that there was no evidence for a cervical radiculopathy, and that Kidder's physician recommended that she participate in "conservative management" to remedy the problem rather than surgery. (Doc. 7-2 at #73). Because the ALJ considered the complete record, including the records of the later-occurring treatment, before deciding to give great weight to the non-treating physicians' medical opinions (which, again, are the only medical opinions in the record), the ALJ did not err. Accordingly, Kidder's first argument lacks merit.

Kidder's second argument is that, in determining Kidder's RFC, although the ALJ did consider some evidence, the ALJ failed to consider *other* "substantial evidence" that indicates Kidder *is* disabled. This argument misunderstands the deference that this Court owes to the ALJ's decisions. As discussed above, an ALJ's findings "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d

762, 772 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Rather, the question is merely whether there is substantial evidence to support the decision the ALJ reached. Here, for the reasons the Magistrate Judge set forth, there is such substantial evidence. And, as substantial evidence supports the ALJ's finding as to Kidder's RFC, there is nothing left for the Court to consider on that front. *See Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018) ("We decide only whether there was substantial evidence to support the ALJ's RFC determination") (citing *Blakely*, 581 F.3d at 406). Thus, Kidder's second argument fails.

For Kidder's final argument, she asserts that the ALJ erred by "interpret[ing] raw medical data [(i.e., the EMG)] in functional terms." (Pl.'s Obj. at 3, #998). While that statement is not a model of clarity, it appears that Kidder's argument is that the ALJ erred by acting as her own medical expert in interpreting Kidder's EMG results to determine her RFC, rather than relying on physician opinions about those test results. Although it is true that an ALJ cannot make an RFC finding based on her own interpretation of raw medical data, *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013), the record shows that the ALJ did not interpret raw medical data here. Rather, it was Kidder's treating physicians—not the ALJ—who read and "interpreted" the EMG at issue. In other words, contrary to Kidder's claim, the ALJ did not directly interpret the EMG itself, but instead relied on the treating physician's interpretation of that EMG, as well as the physician's treatment recommendations based on those interpretations. (Doc. 7-2 at 9, #77 (citing Ex. 13F (physician treatment notes)). That was not an error on the ALJ's part, as an ALJ may assess

13

medical evidence (such as a physician's report), as well as non-medical evidence, in determining the RFC. *Bacon v. Comm'r of Soc. Sec.*, No. 3:19-cv-183, 2020 WL 4923957, at *7 (E.D. Tenn. Aug. 21, 2020) (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)). In fact, the Commissioner (and so, too, the ALJ) can evaluate the medical evidence, not only in assessing the RFC, but also in determining whether an applicant is able to work. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Thus, Kidder's final argument lacks merit.

## CONCLUSION

Substantial record evidence supports the ALJ's finding that Kidder is not disabled under the Social Security Act. And, for the reasons discussed more fully above, the ALJ followed the applicable procedural requirements in reaching that determination. Accordingly, the Court **OVERRULES** Kidder's Objection (Doc. 15), **ADOPTS** Magistrate Judge Bowman's R&R (Doc. 14), **AFFIRMS** the ALJ's finding, **DISMISSES WITH PREJUDICE** Kidder's Complaint (Doc. 1), and **DIRECTS** the Clerk to enter judgment in this action.

**SO ORDERED.**

September 1, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**